UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KORI SUE CLARAMBEAU,<br><br>                              Plaintiff,<br><br>              vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                              Defendant. | 4:19-CV-04170-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Kori Sue Clarambeau, seeks judicial review of the

Commissioner's final decision denying her application for social security

disability under Title XVI and Title II of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Her coverage status for SSD benefits expires on March 31, 2022. AR24; 288. In other words, in order to be entitled to Title II benefits, Ms. Clarambeau must prove disability on or before that date.

Ms. Clarambeau has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1 and 13.  The Commissioner has filed a motion to affirm.  See Docket No. 15.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from Ms. Clarambeau's application for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) with a protected filing date of December 5, 2016, alleging disability starting October 18, 2016, due to chronic lower back pain, fibromyalgia, fatigue, irritability, neck pain, shoulder pain, trouble completing tasks, problems getting along with others, and problems concentrating.  AR248, 253, 332, 373, 376, 377.  Ms. Clarambeau stated in her application documents that she was 5 foot 4 inches tall, and weighed 255 pounds.  AR332.  Ms. Clarambeau stated in the Function Report she completed that she did not handle stress well, and

---

[2] These facts are recited from the parties' stipulated statement of facts (Docket 12).  The court has made only minor grammatical and stylistic changes.  Citations to the appeal record will be cited by "AR" followed by the page or pages.

that she was in a high stress job for 7 1/2 years and had many stomach problems.  AR377.  Ms. Clarambeau's claims were denied at the initial and reconsideration levels and Ms. Clarambeau requested an administrative hearing.  AR108-207, 213-28.

Ms. Clarambeau's administrative law judge ("ALJ") hearing was held July 23, 2018, where different counsel represented Ms. Clarambeau.  AR86-107.  The hearing started at 9:57 a.m. and lasted until 10:26 a.m.  AR88, 107.  An unfavorable decision was issued October 16, 2018 by ALJ Denzel Busick.  AR20-42.

At Step One of the evaluation the ALJ found that Ms. Clarambeau had not engaged in substantial gainful activity since October 18, 2016, the alleged date of disability, and that she was insured for SSDI benefits through March 31, 2022.  AR26.

At Step Two, the ALJ found that Ms. Clarambeau had severe impairments, including obesity, fibromyalgia, degenerative disk disease, degenerative joint disease, high blood pressure, diabetes mellitus, carpal tunnel syndrome, and a sleep disorder.  AR26.  The ALJ found that each of those impairments caused more than a minimal effect on Ms. Clarambeau's ability to perform work-related activities.  AR26.  In Step Three, the ALJ found that Ms. Clarambeau did not have an impairment that meets a Listing.  AR26.

The ALJ determined that Ms. Clarambeau had the residential functional capacity ("RFC") to:

> perform sedentary work . . . except the claimant can stand/walk three hours total in an eight-hour workday; can never climb

3

> ladders, scaffolds or similar devices; can occasionally climb stairs; can occasionally balance, stoop, kneel, crouch, or crawl; can frequently handle and finger bilaterally; and should avoid concentrated exposure to hazards such as unprotected heights or fast and dangerous machinery.

AR27.

The ALJ found that Ms. Clarambeau's impairments could reasonably be expected to cause the symptoms alleged by Ms. Clarambeau; however, her statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." A27.

The ALJ found at Step 4 that Ms. Clarambeau could perform her past relevant work as an accounting clerk, travel agency, and receptionist and denied the claim. AR34-35.

The ALJ considered the opinions of the state agency medical consultants and stated they supported the decision and were consistent with the record and were given weight because they were based on a thorough review of the records showing Ms. Clarambeau had ongoing treatment for pain and back problems, but she consistently had "mostly normal physical examinations with full strength and normal gait." AR33-34.

The ALJ noted that Ms. Clarambeau was on Family and Medical Leave Act ("FMLA") leave from work from October 19, 2016, to February 1, 2017, and that her employer had no positions available that would satisfy Ms. Clarambeau's work restrictions, and stated he considered those statements. AR29.

4

The ALJ considered the opinion of Ms. Clarambeau's treating orthopedic specialist, Corey Rothrock, MD, who the ALJ asserted had limited Ms. Clarambeau to lifting no more than 10 pounds, standing for four hours, and sitting for four hours, and gave the opinions "some weight" because they were based on Dr. Rothrock's treatment of Ms. Clarambeau, but to the extent the opinions indicated Ms. Clarambeau could not sit for six hours in an 8-hour workday he gave them "less weight" because the records support a finding that Ms. Clarambeau can perform a range of sedentary work, noting she cared for her ailing mother and engaged in exercise as possible for weight loss.  AR32. The ALJ also stated, "she has ongoing tenderness and reported pain symptoms, but she had mostly normal physical examinations and remains able to function."  AR32.

The ALJ considered the opinions of Ms. Clarambeau's treating orthopedic specialist, James Brunz, MD, and gave them "some weight" stating they were consistent with the record and based on Dr. Brunz's treatment of Ms. Clarambeau, but gave less weight to the more recent opinions because they did not provide specific functional limitations.  AR32.  The ALJ stated that the earlier opinions indicated Ms. Clarambeau could perform a range of sedentary work, but Dr. Brunz's opinion that Ms. Clarambeau could not stand/walk six hours and could only rarely stoop were given "less weight" because although Ms. Clarambeau had ongoing treatment for her back problems and pain, "she consistently had mostly normal physical examinations."  AR32-33.

The ALJ considered the opinion of Nate Timmer, MD, that Ms. Clarambeau was not disabled because she had not tried all possible treatments and frequently missed physical therapy.  AR33.  The ALJ observed that these opinions supported the decision but they are given little weight because they do not provide specific functional limitations and opinions whether a claimant is disabled or unable to work are administrative findings reserved to the Commissioner.  AR33.

The ALJ considered the opinions of Ms. Clarambeau's treating physician, Thomas Ripperda, MD, a physical medicine/rehabilitation physician, and gave Dr. Ripperda's initial short-term limitations "little weight" because they did not specify Ms. Clarambeau's ongoing limitations over a period of at least 12 months, and his later opinions "some weight" but gave "little weight" to Dr. Ripperda's opinions that Ms. Clarambeau was limited to less than six hours sitting in an 8-hour workday and she needed to frequently change position, because the ALJ asserted Ms. Clarambeau's symptoms improved with treatment and except for some tenderness and occasional limited range of motion, Ms. Clarambeau consistently had good physical examinations.  AR33.

The Appeals Council denied Ms. Clarambeau's request for review making the ALJ's decision final, and Ms. Clarambeau timely filed this action.  AR1-6.

## B.    Medical Evidence (chronological order)

Ms. Clarambeau received periodic chiropractic treatment from Rebecca Studelska, DC, including treatment from 2009 through 2016 for various areas of her spine.  AR477-95, 838-74.  In a letter to the State agency, Chiropractor

Studelska stated Ms. Clarambeau was treated in 2016 for symptoms including constipation, brain fog, myalgia/fibromyalgia, fatigue, and tingling in both hands. AR476. Chiropractor Studelska opined that Ms. Clarambeau was of competent mental ability and she would likely have difficulty with carrying and lifting objects, as well as twisting actions such as sweeping, vacuuming and mopping. AR476. Chiropractor Studelska commented that sitting and standing were not a concern for Ms. Clarambeau. AR476.

On May 14, 2013, Ms. Clarambeau had back surgery including a right L3 partial hemilaminectomy and right hemilaminectomy and removal of extruded disk, L4-5 on the right. AR733-34, 737-39, 744-46, 751-53.

A chest x-ray was obtained on March 7, 2016, due to a persistent cough that revealed lungs clear bilaterally, osteophytes in the thoracic spine, and no acute cardiopulmonary findings. AR502.

On March 26, 2016, Ms. Clarambeau saw Rich Zieske, PA-C, at Core Orthopedics for an evaluation of carpal tunnel syndrome. AR991-93. An x-ray of the left wrist showed calcification over the palmar carpal row. AR993. Physician Assistant Zieske's impression was bilateral hand paresthesias consistent with carpal tunnel syndrome and recommended an electromyography (EMG) and nerve conduction velocity (NCV) study of her bilateral upper extremities. AR993.

On May 2, 2016, Ms. Clarambeau saw Dr. Ripperda at Avera Physical Medicine and Rehabilitation for bilateral arm pain, numbness, and tingling on and off for three years. AR563. EMG and NCV studies were abnormal and

showed evidence of a severe right sensory motor median neuropathy at the wrist consistent with severe right carpal tunnel syndrome and findings on the left consistent with moderate/severe left carpal tunnel syndrome. AR566, 636-39, 755-57, 889-90. Carpal tunnel surgery was planned with Ms. Clarambeau off work for four weeks after surgery. AR891.

On May 9, 2016, Ms. Clarambeau saw J. David Watts, MD, at Core Orthopedics for right greater than left hand numbness and tingling. AR989. She reported losing grip strength and was already wearing braces, but had continued symptoms. AR989. Examination revealed positive carpal tunnel compression test in both hands, reduced grip strength, and positive Tinel's sign at the wrist. AR989. Surgery was planned first on the right wrist with the left to follow two weeks later. AR989.

Ms. Clarambeau's liver functions were elevated on June 23, 2016, and she was told to stop taking Crestor, and not to take any Aleve, Ibuprofen, or alcohol. AR609.

On July 6, 2016, J. David Watts, MD, performed a left hand open carpal tunnel release for Ms. Clarambeau. AR994. Ms. Clarambeau's medical provider stated that she would be off work from July 6, 2016, to July 24, 2016, and that she could return to work on July 25, 2016, without restrictions. AR892-93.

On August 9, 2016, Ms. Clarambeau contacted the Avera Internal Medicine Clinic to ask if she could take Ibuprofen for her back pain with her history of elevated liver functions and medical personnel told her they would

8

consult a doctor and let her know.  AR607.  Ms. Clarambeau received a

prescription for Ibuprofen the same day and was advised to take 400mg every

12 hours as needed.  AR607-08.

Left knee x-rays were obtained on August 19, 2016, due to knee pain

that revealed no acute fracture, but showed joint effusion and lateral patellar

tracking.  AR522.

On September 14, 2016, a lumbar magnetic resonance imaging ("MRI")

scan was obtained due to degenerative disc disease that revealed postoperative

changes of the lumbar spine, and multilevel disc disease with the most

advanced findings of moderate-severe right neural foraminal narrowing at L5-

S1.  AR528, 760-61.  Moderate right foraminal narrowing at L4-5 and left

neural foraminal narrowing at L5-S1 along with moderate-severe effacement of

the right lateral recess at L3-L4.  AR528.

On October 6, 2016, Ms. Clarambeau saw Michael Puumala, MD, at

Avera Neurosurgery due to worsening low back pain with weakness and

tingling, which began a week after returning from a trip to Alaska.  AR762,

940.  She had tried chiropractic treatment and a course of steroids, which

helped for a short time.  AR762, 940.  Ms. Clarambeau also complained of right

knee pain and had been given a cortisone injection for her knee.  AR762, 940.

A radiology report showed no evidence of acute osseous or alignment

abnormality of the lumbar spine.  AR603, 768.  An MRI scan had been

obtained which did suggest "pathology," she had been given a second course of

steroids, and was taking Tramadol for pain.  AR762.  Dr. Puumala's

9

examination documented tenderness to lumbar spine, normal motor strength, negative straight leg raises, able to toe and heel walk, wide based gait due to body habitus, normal reflexes except for an absent Clonus, some sensory abnormality in the right lower extremity, and Dr. Puumala's read of the MRI scan included foraminal stenosis to the right at L5, and significant disc space narrowing at L4-5, which may also be a generator of pain.  AR766, 944.  An MRI scan with and without gadolinium and flexion/extension x-rays were ordered.  AR767, 944.  Dr. Puumala assessed Ms. Clarambeau with lumbar degenerative disc disease.  AR766, 944.

Another lumbar MRI scan with contrast was obtained on October 14, 2016, for listed reasons of low back pain and history of lumbar surgery. AR532.  The radiologist's impression was of grossly stable edema in the left L4 pedicle and transverse process and in the left L3 pedicle which may be the result of a stress reaction; grossly stable postoperative changes and multilevel degenerative changes in the lumbar spine, and no significant abnormal enhancement identified aside from mild enhancement surrounding degenerative facet changes at the L3-L4 and L4-5 levels.  AR533.  The radiologist's findings included: at L2-L3 mild broad-based posterior disc bulge and infolding of the ligamentum flavum causing mild narrowing with no significant neural foraminal narrowing; L3-L4 loss of disc height, postsurgical changes, mild broad-based posterior disc bulge along with facet arthropathy and infolding of the ligamentum flavum, small right paracentral annular fissure inferiorly, and moderate narrowing of the spinal canal with moderate-

severe effacement of both lateral recesses with compression upon the
descending  L4 nerve roots in the lateral recess that cannot be entirely
excluded, and no significant neural foraminal narrowing; L4-L5 showed loss of
disc height, postsurgical changes mild residual broad-based sequential disc
bulge, facet arthropathy, no significant spinal canal narrowing, moderate right
and no significant left neural foraminal narrowing; and L5-S1 showed loss of
disc height and disc desiccation with a mild-moderate broad-based posterior
disc bulge and bilateral facet arthropathy, no significant spinal canal
narrowing, and moderate-severe right and moderate left neural foraminal
narrowing.  AR532-33, 769-70, 895.

On November 30, 2016, Ms. Clarambeau saw Dr. Ripperda for low back
pain. AR569, 642.  Dr. Ripperda noted Ms. Clarambeau's long history of low
back pain and prior disc herniation that was treated surgically, and a history of
fatigue and general musculoskeletal complaints secondary to past diagnosis of
fibromyalgia.  AR569-70, 642-43.  Ms. Clarambeau reported increased back
pain the last three to four months with radiation to the right hip that was
impacting her activities, including bending, twisting, walking, and sitting in a
chair.  AR569-70.  Ms. Clarambeau was working as a custodian for the past
year and a half.  AR570.  Ms. Clarambeau reported difficulty sleeping,
dizziness, shaking tremor of both hands, sense of weakness particularly in the
right leg, and pain in her hips, neck, shoulders, back and feet, as well as
intermittent constipation, diarrhea, and heartburn.  AR570.  An examination
revealed a trace of lower extremity edema; pain with hip flexion, abduction,

internal rotation, and pain with Faber's maneuvers bilaterally; tenderness primarily over L4-L5 and L5-S1 facet joints on the right side; positive facet loading on the right side; some piriformis tenderness bilaterally; and greater trochanteric tenderness bilaterally. AR570. Dr. Ripperda documented that Ms. Clarambeau had symmetric leg lengths; no joint deformities in the lower extremities; normal muscle strength in the lower extremities; normal muscular tone without muscle atrophy; good coordination of both lower extremities; normal gait pattern; appropriate mood, affect, and was pleasant; and she was able to stand on her toes and heels without any difficulty. AR570, 643, 772-73, 778-79. Dr. Ripperda's impressions included lumbar facet syndrome at L4-L5 and L5-S1; previous lumbar radiculopathy status post microdiscectomy with good improvement in overall symptomatology; and fibromyalgia. AR571, 644, 773, 779. Dr. Ripperda recommended branch block injections with consideration of proceeding to radiofrequency ablation depending on her response. AR571, 644, 773, 779. Dr. Ripperda also recommended biofeedback and cognitive behavioral therapy to improve overall symptomatology and possibly Lidoderm patches or lidocaine ointment and Gabapentin or Lyrica as other options. AR571, 644, 773. Dr. Ripperda provided work limitations for Ms. Clarambeau for the next two months until she completes radiofrequency, restricting her to occasional lifting up to 10 pounds; 3-5 hours per day standing; 3-5 hours per day sitting; occasionally using the stairs; and no bending, carrying, or kneeling. AR571, 581, 773. The release/return to work

form Dr. Ripperda completed for Ms. Clarambeau's job (POET) defined occasional lifting as only lifting 1-3 times per shift.  AR581.

Ms. Clarambeau received right L3, L4 and L5 diagnostic branch blocks corresponding to innervation of the L4-5 and L5-S1 facet joints on December 12, 2016.  AR598.  Timothy J. Metz, MD, observed that at 20 minutes post injection, Ms. Clarambeau could laterally bend without significant pain on the right side, but felt some tension and pull across the low back.  AR598.

On January 12, 2017, Ms. Clarambeau saw Dr. Ripperda for continued low back pain and reported that symptoms were better with heat and lying down.  AR575, 648, 786-91.  Dr. Ripperda's examination revealed pain to palpation over the sacroiliac ("SI") joints, mild tenderness over the lumbar paraspinals, and a pop with hip abduction, flexion, and adduction.  AR576, 649, 787.  Dr. Ripperda also noted that Ms. Clarambeau had fairly symmetrical hip internal rotation; good knee and ankle range of motion; symmetrical leg lengths; mildly reduced reflexes of the right patella; normal bilateral lower extremity strength; normal muscular tone; and normal gait pattern.  AR576, 649.  Dr. Ripperda recommended SI joint injections; Gabapentin and Cymbalta; and biofeedback.  AR576, 649.  Ms. Clarambeau reported she was doing office work.  AR576, 649.  Ms. Clarambeau reported working about three hours per day.  AR576.  Dr. Ripperda provided work limitations for Ms. Clarambeau restricting her to sedentary duty for 4 hours a day with no lifting over 10 pounds and pushing/pulling up to 15 pounds.  AR582, 896.

13

Ms. Clarambeau received bilateral intraarticular SI joint injections from Dr. Metz on January 23, 2017, following minimal improvement of the prior diagnostic blocks.  AR589.  Ms. Clarambeau reported at most a 50 percent improvement in her symptoms from her December, 2016, medial branch block. AR589, 597-98.

On March 15, 2017, Ms. Clarambeau saw Dr. Ripperda for continued low back pain, worse with bending, walking, standing, and lifting, and better when lying down.  AR654, 792.  Dr. Ripperda documented that Ms. Clarambeau had normal bilateral lower extremity strength; normal muscle tone without atrophy; normal deep tendon reflexes; appropriate mood and affect; and was able to stand on her toes.  AR655, 793.  Dr. Ripperda concluded her pain was consistent with right sacroiliac joint dysfunction, noting the good, but temporary results from an SI joint injection.  AR655, 793.  Dr. Ripperda recommended physical therapy, a second joint injection, stabilization exercises, home exercise program, possible SI joint locking belt, and radiofrequency neurotomy to be considered pending response to the injection.  AR655, 793. On March 15, 2017, Dr. Ripperda provided limitations for Ms. Clarambeau to Unum Insurance including no lifting over 10 pounds; 3-5 hours per day standing; 3-5 hours per day sitting; no kneeling; and only occasional bending, carrying and stairs.  AR888.  Dr. Ripperda also stated that Ms. Clarambeau be allowed to change position frequently.  AR888.

Ms. Clarambeau had physical therapy treatments at Avera Queen of Peace Hospital on April 4, 5, 7, 12, 14, 17, 19, 21, 25, 26, 28, May 1, 5, 8, 15,

18, 22, November 7, 9, 15, 16, 20, 22, 24 and December 4, 5, 11, 13, 14 and

19 in 2017.  AR716-19.

On May 10, 2017, Ms. Clarambeau was seen at Orthopedic Institute by

Dr. Rothrock for right lower back, hip and SI joint pain.  AR699, 1055.  She

had been taking gabapentin and Tramadol with only short-term relief and was

receiving chiropractic treatment.  AR699, 1055.  Ms. Clarambeau's body mass

index ("BMI") was 47.5, and Dr. Rothrock's examination revealed lower

extremities neurovascular intact, right SI joint tenderness, negative

anterioposterior ("AP") and lateral compression, negative Faber's test; full and

preserved range of motion in hips, no muscle atrophy, and excellent deep

tendon reflexes and sensation.  AR699, 1055.  X-rays showed some ossification

within the iliopsoas on the inner table of the medial wall of the pelvis,

questionable interior sclerosis of the right SI joint, normal bilateral SI joints,

normal hip joints, and degenerative changes at L4-5.  AR699, 1055.  She had

prior excellent response to SI joint injection, but if she continued to fail

conservative treatment and could achieve a BMI below 40, she may be a

candidate for an SI joint fusion.  AR699, 1055.  Dr. Rothrock recommended

continued conservative care.  AR699.  Dr. Rothrock completed a return to work

form and limited Ms. Clarambeau to no lifting greater than 10 pounds and only

four hours standing, and four hours sitting.  AR897, 1058.

Ms. Clarambeau saw Dr. Timmer at Avera Family Clinic on May 15,

2017, for a medication check, follow-up after an emergency room visit for

vertigo, and to discuss trying to reduce her weight so she could have surgery

15

on her SI joints.  AR958, 962.  She also complained of feeling down and depressed with lost interest in things, decreased energy, sleeping more frequently, and decreased appetite.  AR962.  Ms. Clarambeau also indicated anxiety from work.  AR960.  Ms. Clarambeau reported that she took her Tramadol rarely and has been doing water aerobics and maneuvers without significant pain.  AR962.  Ms. Clarambeau reported that she gets worsening pain with almost any movement.  AR962.  Ms. Clarambeau was also taking care of her 88-year old mother.  AR962. Dr. Timmer's examination revealed that Ms. Clarambeau was alert and not in any acute distress; had no neurological deficits; had no edema; and had normal affect.  AR962-63. Dr. Timmer stated they may proceed with treatment for major depression, and he would consider medications for weight loss, but not until her blood pressure was under control.  AR963.

Ms. Clarambeau saw Dr. Timmer at Avera Family Clinic on May 25, 2017, with complaints of increased fatigue and chest tightness, and had lost ten pounds in the last ten days.  AR964, 968.  Zoloft was prescribed in addition to her Cymbalta for mood and anxiety, and weight loss medication was started. AR701, 969.

On June 8, 2017, Ms. Clarambeau visited Dr. Puumala, who noted that he had last seen her on October 6, 2016.  AR805, 938.  Dr. Puumala noted that Ms. Clarambeau complained of back and left leg pain.  AR805.  Upon examination, Dr. Puumala noted Ms. Clarambeau had a wide-based gait due to her body habitus; she was somewhat slow getting out of the chair; strength

appeared good; she was very tender over the greater trochanter on the left; she complained of dysesthetic type pain in the distribution of the lateral cutaneous nerve of the thigh.  AR805.  Dr. Puumala reviewed Ms. Clarambeau's MRI scan of the lumbar spine and x-rays that showed post-operative changes without any abnormal movement; degenerative change with some lateral recess stenosis at L3-4 on the left; and no changes in the severe disc height loss as in previous imaging from October 6, 2016.  AR805, 938.  Dr. Puumala's impression was that she did not have radicular syndrome and that she had relief with an SI joint injection; and she had meralgia paresthetica giving her dysesthesias in the distribution of the lateral cutaneous nerve of the thigh. AR805, 938.  Dr. Puumala did not recommend any surgical intervention for Ms. Clarambeau's back and recommended that she continue with conservative treatment and consider an injection to the greater trochanter or SI joint. AR805.

On June 27, 2017, Ms. Clarambeau saw Phillip Becker, MD, at the Avera Pain Management Center for a second opinion regarding her chronic low back and right hip pain.  AR799, 946, 950.  Dr. Becker noted that the October 14, 2016, MRI scan showed multilevel degenerative disc disease from L2 to S1 with moderate central stenosis at L3-4 and moderate severe narrowing of the lateral recesses, and that there was felt to be some compression upon the L4 nerve roots at that level.  AR799, 946, 950.  Ms. Clarambeau reported that her pain is generally better if she takes Tramadol or Aleve or alternates ice and heat on the area.  AR800, 951.  Dr. Becker's examination revealed Ms. Clarambeau's

weight as 266 pounds; she easily rose out of a seated position; she had fairly normal gait with slight limp favoring the right side; pain in the right sacroiliac area with bending; negative straight leg raises except for a complaint of pulling the right SI joint area pain; tenderness near the scar at L3; diffuse tenderness from upper shoulder area down through the thoracic and lumbar area as well as into the gluteal and iliotibial band area; right hip testing caused pain in the right low back and SI joint area; good range of motion noted throughout the lower extremity joints; and a little increased pain with SI joint provocation and with prone facet loading on the right side.  AR801, 947-48, 951-52.  Dr. Becker stated the diffuse tenderness was certainly consistent with her fibromyalgia.  AR801, 947, 952.  Dr. Becker documented that deep tendon reflexes and sensory were intact throughout the lower extremities and her motor strength was normal.  AR801, 948, 952.  Dr. Becker's impressions included right sacroiliitis and sacroiliac joint dysfunction, multilevel disc disease with possible nerve compression on the L4 nerve root at the L3-4 level, chronic fibromyalgia, left meralgia paresthetica, and morbid obesity.  AR801, 948, 952.

On July 13, 2017, Ms. Clarambeau saw Dr. Timmer at Avera Family Clinic for follow up on her medications and weight loss.  AR970.  Her patient health questionnaire (PHQ-9) score for depression screening was 12, which is within the range of scoring where physicians use clinical judgment about treatment, based on the patient's duration of symptoms and functional impairments.  AR971.  Ms. Clarambeau reported that her symptoms had made it very difficult to do work, take care of things at home, or get along with other

18

people.  AR971.  Ms. Clarambeau had lost 20 pounds over the last two months representing 7.5% of her body weight, was tolerating her medication well, and her appetite was reduced on Phentermine.  AR975.  She also reported that her mother had been moved to a nursing home and that her depression was not getting worse, but that she was getting used to this change.  AR975.

Ms. Clarambeau saw Dr. Becker at the Avera Pain Management Center on July 25, 2017, and was administered a right sacroiliac space injection. AR807, 954-56.  Ms. Clarambeau experienced significant pain following Dr. Becker's prior comprehensive exam so a repeat exam was not performed. AR807, 954.

Ms. Clarambeau saw Dr. Brunz at the Orthopedic Institute on October 25, 2017, by referral from Dr. Becker for her low back pain with her most recent episode starting in August, 2016.  AR1059-60.  Upon examination, Dr. Brunz documented that Ms. Clarambeau appeared well, alert, and oriented; had appropriate mood and affect; showed diminished musculoskeletal range of motion; lumbar paraspinous tenderness; exquisite right piriformis tenderness; negative pelvic compression test; intact cranial nerves; no focal motor or sensory deficits; normal deep tendon reflexes; and normal gait.  AR1059. Dr. Brunz assessed degenerative lumbar disc disease without evidence of radiculopathy, lumber spondylosis with no response to facet blocks, and piriformis dysfunction.  AR1059.  Dr. Brunz stated that most of Ms. Clarambeau's symptoms were from piriformis dysfunction and myofascial pain, and trigger point injections were given at her right piriformis.  AR1060.

19

Dr. Brunz also recommended that Ms. Clarambeau reinstate water therapy, continue Gabapentin, and encouraged her to taper off Tramadol given the lack of efficacy data to support long-term opioid therapy.  AR1060.  Dr. Brunz prescribed physical therapy for Ms. Clarambeau for a duration of four weeks, with a frequency of two to three times a week.  AR957.

On November 16, 2017, Ms. Clarambeau visited Dr. Timmer for a checkup regarding her weight.  AR977. Ms. Clarambeau reported to Dr. Timmer that she was currently participating in physical therapy.  AR982. Dr. Timmer told Ms. Clarambeau that she must start exercising on a routine basis and work on her diet.  AR982.

Ms. Clarambeau was seen at Orthopedic Institute on November 27, 2017, for a recheck of her low back pain and reported receiving only minimal relief from the October injections, and her pain had returned to baseline. AR1061.  Lori Lawson, DNP, Dr. Brunz's nurse practitioner, documented Ms. Clarambeau's physical examination, noting that Ms. Clarambeau had diminished lumbar range of motion, normal hip range of motion, lumbar paraspinous tenderness bilaterally, right piriformis tenderness, no trochanteric tenderness, negative straight leg raises, intact cranial nerves, no focal motor or sensory deficits, normal deep tendon reflexes, and normal gait.  AR1061. Nurse Practitioner Lawson assessed myofascial pain/piriformis syndrome, lumbar spondylosis with no response to facet blocks, and degenerative lumbar disk disease without evidence of radiculopathy.  AR1061.  Nurse Practitioner Lawson discussed treatment options with Ms. Clarambeau and that much of

her pain is coming from her muscles.  AR1062.  Nurse Practitioner Lawson encouraged Ms. Clarambeau to continue physical therapy and eventually transition into water therapy.  AR1062.  The trigger point injections were administered again.  AR1062.

Ms. Clarambeau saw Dr. Brunz at the Orthopedic Institute on December 18, 2017, for a recheck of her ongoing low back pain and reported she received no improvement from the November trigger point injections and that her symptoms were worse for a week.  AR1063.  Dr. Brunz's physical examination revealed diminished musculoskeletal range of motion, lumbar tenderness, and right piriformis tenderness, but no sacroiliac tenderness, no trochanteric tenderness, negative straight leg raises, no focal motor or sensory deficits, normal deep tendon reflexes, normal gait, and intact cranial nerves.  AR1063. Dr. Brunz assessed myofascial pain, degenerative lumbar disc disease with lateral recess stenosis at L3, and a history of prior laminectomy at L4. AR1063.  A limited bone scan was ordered with an epidural injection at L3 if the bone scan was unremarkable.  AR1063.

A bone scan obtained on January 3, 2018, showed Ms. Clarambeau had mild skeletal activity consistent with degenerative changes in the knee joints, lumbar spine, and thoracic spine and acromioclavicular ("AC") joints.  AR810.

Ms. Clarambeau received a L3-4 interlaminar epidural steroid injection on January 16, 2018, administered by Dr. Brunz of Midwest Pain Specialists. AR812, 1000-01, 1007, 1054.

Ms. Clarambeau saw Dr. Timmer on February 12, 2018, complaining of continued low back pain, and reported no improvement following a recent epidural injection.  AR987.  Ms. Clarambeau had gained weight since her last check; she was fairly noncompliant with medications for weight loss; and Dr. Timmer felt her prognosis for weight loss was poor.  AR987-88.  Dr. Timmer told Ms. Clarambeau that she would likely have back pain the rest of her life and that she may be able to be helped a little bit, but not cured of that pain. AR988.  Dr. Timmer explained to Ms. Clarambeau that weight loss, exercise and healthy diet were crucial.  AR988.  He also said he did not feel "she is disabled due to this back pain," planned to try Lyrica and encouraged her to follow-up with Orthopedic Institute.  AR988.

Ms. Clarambeau was seen at the Orthopedic Institute on February 13, 2018, for a recheck of her low back pain and reported receiving very minimal relief for only a short period from the prior epidural injection.  AR1078. Ms. Clarambeau denied any pain or paresthesias into her lower extremities or frank numbness or gross motor weakness in her lower extremities.  AR1078. Examination revealed lumbar paraspinous tenderness, right piriformis tenderness, pain with palpation of SI joint, and positive FABER (Patrick's) test for flexion, abduction and external rotation.  AR1078.  Nurse Practitioner Lawson documented that Ms. Clarambeau had no trochanteric tenderness, negative straight leg raises, intact cranial nerves, no focal motor or sensory deficits, normal deep tendon reflexes, and normal gait.  AR1078.  A right SI joint injection was administered.  AR1078-79.  Ms. Clarambeau received a right

SI joint steroid injection on February 21, 2018.  AR819, 1049.  On February 26, 2018, Dr. Brunz provided a right intra-articular SI joint injection for Ms. Clarambeau.  AR820, 1001, 1006, 1050.

Ms. Clarambeau saw Greg Alvine, MD, at Core Orthopedics on March 22, 2018, with continued right-sided low back pain.  AR998.  Examination revealed tenderness over the right SI joint, and positive SI joint provocative maneuvers on the right side.  AR998.  Dr. Alvine also documented normal motor strength, symmetrical deep tendon reflexes, negative clonus, palpable pulses, and negative sitting straight leg raise.  AR998.  Dr. Alvine also reviewed the x-rays and MRI scans and diagnosed right-sided pain suggestive of SI joint pain.  AR998-99.  He noted the L4-5 disc was quite collapsed and narrow, and Ms. Clarambeau's SI joint seemed inflamed by exam, but he would be reluctant to do a SI joint fusion, and he did not feel a lumbar fusion was going to help, so he did not have a good surgical solution.  AR999.  Dr. Alvine recommended continued conservative treatment, the home exercise program that Ms. Clarambeau's therapist taught her, and following up with Dr. Brunz for pain management.  AR999.

Ms. Clarambeau saw Dr. Brunz on April 11, 2018, for a recheck of her ongoing low back pain and reported she received 20 percent improvement for one week from the prior SI joint injection and her pain was back to baseline.  AR1082.  Ms. Clarambeau reported that she never returned to Dr. Ripperda for further treatment.  AR1082.  Examination revealed diminished musculoskeletal range of motion, right piriformis tenderness, and pain with extension.  AR1082.

Dr. Brunz also noted normal hip range of motion, no SI tenderness, no paraspinous tenderness, no trochanteric tenderness, negative straight leg raises, intact cranial nerves, no focal motor or sensory deficits, normal deep tendon reflexes in the lower extremities, and normal gait.  AR1082. Ms. Clarambeau's gabapentin was discontinued, her Lyrica dosage was increased, and radiofrequency ablation was considered with appropriate response to medial branch blocks.  AR1082.

Ms. Clarambeau received a right L4-5 and L5-S1 diagnostic medial branch blocks for test denervation on April 23, 2018, administered by Dr. Brunz of Midwest Pain Specialist, which showed no paresthesias.  AR1002-05.  Dr. Brunz performed a right L3 medial branch block, a right L4 medial branch block, and a right L5 dorsal primary rami branch block.  AR1002-05, 1047.  Ms. Clarambeau reported that her pain dropped to two-thirds for four hours post injection and then gradually increased to baseline.  AR1087.  In a second call, she reported 75 percent improvement for hours 1-4, then 60 percent for hour 5.  AR1087-88.  Repeat injections were planned.

On May 1, 2018, Dr. Brunz performed a right L3 medial branch block, right L4 medial branch block, and right L5 dorsal primary rami branch block.  AR1008-09, 1044.  On May 2, 2019, Ms. Clarambeau reported that her injection the day prior provided 60 percent pain relief for the first two hours, 55 percent pain relief at the third hour, 50 percent at hour four, and 40 percent pain relief at hour five.  AR1094.

Ms. Clarambeau contacted the Orthopedic Institute on April 25, 2018, and the phone record stated, "patient called stating that JTB [Dr. Brunz] told her he would write a letter to help her approve for early disability?  She had some questions on that...."  AR1090.  The notes indicated that Dr. Brunz dictated the letter on May 11, 2018, and it was mailed by May 15, 2018. AR1090, 1096.  The record contains an undated letter from Dr. Brunz regarding Ms. Clarambeau.  AR1105.  Dr. Brunz noted Ms. Clarambeau's history of low back pain, fibromyalgia, and injection therapy treatments, including medial branch blocks, SI joint injections, and epidural injections. AR1105.  Dr. Brunz noted that Ms. Clarambeau had a positive response to medial branch blocks.  AR1105.  Dr. Brunz stated that radiofrequency ablation or rhizotomy was planned and he expected it to improve her chronic back pain. AR1105.  Dr. Brunz stated Ms. Clarambeau reported pain with bending, twisting, standing and walking for prolonged periods and her symptoms could prevent her from performing more physical duties, and he invited further inquiry if there were questions.  AR1105.

Ms. Clarambeau saw Dr. Brunz on May 29, 2018, following a positive response from medial branch blocks.  AR1010.  Dr. Brunz performed right L3 medial branch radiofrequency ablation, right L4 medial branch radiofrequency ablation, and right L5 dorsal primary rami branch radiofrequency ablation. AR1010-11, 1030-36.

The record includes a medical source statement with all the sections on limitations left blank, and a statement from Dr. Timmer stating, "Patient is not

25

disabled, has not tried all possible treatments and frequently misses PT," dated

June 12, 2018.  AR1099-1101.

Dr. Brunz completed a medical source statement dated June 12, 2018,

in which he stated Ms. Clarambeau was limited to occasionally and frequently

lifting 10 pounds; standing or walking four hours with normal breaks; sitting

four hours; unlimited pushing and/or pulling with 10 pound limitation;

frequently climbing ramps/stairs, balancing and kneeling; occasionally

climbing ladders, scaffolds, and crouching; rarely stooping; and frequently

reaching, handling, fingering, and feeling; avoid concentrated exposure to

vibration and hazards; and unlimited exposure to extreme cold, extreme heat,

wetness, humidity, noise and fumes.  AR1102-04.  Dr. Brunz noted that these

restrictions had been initiated by Dr. Rothrock on May 10, 2017.  AR1104.

Ms. Clarambeau was seen at the Orthopedic Institute on June 26, 2018,

for a recheck of her low back pain and reported being unable to tell if she was

receiving any relief from the radiofrequency ablation treatment; she noted some

improvement with sitting, but continued to struggle with dull achy pain in her

low back and buttocks.  AR1108.  Ms. Clarambeau denied pain or paresthesias

that traveled to her lower extremities, any frank numbness or gross motor

weakness in the lower extremities, or any acute changes in bowel or bladder

function.  AR1108.  Nurse Practitioner Lawson's examination revealed slightly

diminished lumbar range of motion, lumbar paraspinous tenderness, piriformis

tenderness, normal hip range of motion, no SI tenderness, no trochanteric

tenderness, negative straight leg raises, intact cranial nerves, no focal motor or

26

sensory deficits, normal deep tendon reflexes in the lower extremities, and normal gait.  AR1108.  Trigger point injections and piriformis injections were administered.  AR1108-09.

Ms. Clarambeau saw Dr. Brunz on July 30, 2018, for a recheck of her low back pain and had received a piriformis injection at her last visit with some improvement in her buttock pain.  AR1106.  She was being weaned off Lyrica and Sertraline by Dr. Timmer with a plan to switch to Savella.  AR1106. Dr. Brunz's examination revealed bilateral piriformis and lumbar paraspinous tenderness, normal lumbar range of motion, normal hip range of motion, no SI tenderness, no trochanteric tenderness, negative straight leg raises, intact cranial nerves, no focal or sensory deficits, normal deep tendon reflexes in the lower extremities, and normal gait.  AR1106.  Dr. Brunz assessed myofascial pain.  AR1106.  Repeat trigger point injections were administered in the right and left paraspinous muscles.  AR1106.

Dr. Brunz wrote a letter dated August 1, 2018, regarding Ms. Clarambeau and noted her impairments included chronic myofascial pain, lumbar spondylosis, and degenerative lumbar disc disease without radiculopathy.  AR1110.  He also noted L3 epidural injection treatment, SI joint injection treatment, soft tissue injection treatment, and lumbar radiofrequency ablation treatment.  AR1110.  Dr. Brunz stated that although her symptoms improved following radiofrequency ablation, she continued to have myofascial pain, which may limit her ability to do medium-to-heavy work.  AR1110.

27

**C.**      **State Agency Assessments**

The State agency medical consultant, Gregory Erickson, MD, reviewed the medical and other evidence on March 15, 2017, and concluded Ms. Clarambeau had severe spine disorders and fibromyalgia, and non-severe hypertension, hyperlipidemia, diabetes, carpal tunnel, and sleep-related breathing disorders.  AR108-14.  Dr. Erickson concluded Ms. Clarambeau was limited to lifting 10 pounds occasionally; less than 10 pounds frequently; standing or walking four hours per day with normal breaks; sitting more than six hours per eight-hour workday; unlimited pushing and/or pulling (including operation of hand and/or foot controls) unlimited with lifting and carrying limitations; and occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching and crawling.  AR115-17.  Dr. Erickson concluded that Ms. Clarambeau could relieve her pain from sitting with normal breaks and lunch periods, that she could never climb ladders because she was unable to support her own weight, and she should avoid concentrated exposure to hazards because pain will limit her mobility.  AR116-17.

On June 2, 2017, the State agency medical consultant at the reconsideration level considered the medical and other evidence in the record at that time, and made essentially identical findings and comments, except the medical consultant stated that Ms. Clarambeau "can relieve pain from sitting with normal breaks and lunch periods and by shifting position as needed and standing to stretch for one minute each hour when necessary."  AR138-49.

An SSA medical consultant, Celio Burrowes, MD, reviewed the State agency's assessment and evidence of record on June 22, 2017, and stated that she agreed with the assessment except Ms. Clarambeau should be limited to eight pounds for frequent lifting and carrying.  AR659-61.

**D.    Other Evidence**

Employer attendance records show that Ms. Clarambeau returned to work in December, 2016, working less than four hours per day.  AR311. Ms. Clarambeau completed a Work Activity Report stating when she returned to work in December, 2016, she was working 15 hours per week, and they changed her to a job where she could sit at a desk.  AR317-18.

Ms. Clarambeau received a letter from her employer, POET, summarizing that she was on medical FMLA leave from working beginning October 19, 2016, and Ms. Clarambeau's FMLA benefits were exhausted as of February 1, 2017. Her employer stated they had no positions available that could accommodate the restrictions from her doctor so she was terminated.  AR406.  The restrictions included with the letter were the restrictions from Dr. Ripperda dated November 30, 2016, and January 12, 2017.  AR407-08.

Ms. Clarambeau sought assistance from South Dakota Vocational Rehabilitation Services on May 1, 2017, to obtain part-time work and was found eligible for services due to her impairments.  AR448-52.

**E.     Testimony at the ALJ Hearing**

**1.     Ms. Clarambeau's Testimony**

Ms. Clarambeau testified that her last restrictions included a limit to three to four hours sitting and if she sits that much her back really hurts, especially in the SI joint, and she gets some uncomfortable tingling in her feet. AR96.  She said she can stand about 10 minutes before she needs to move around and she lasted half an hour walking the other day at Walmart and was out of Walmart in 45 minutes.  AR97.

Ms. Clarambeau testified that her janitorial job involved vacuuming, mopping, sweeping, dusting, cleaning out light fixtures, mowing the lawn, and carrying garbage that could sometimes be well over 50 pounds.  AR97-98.

Ms. Clarambeau testified that her fibromyalgia causes her shoulders to get hard and tight, limiting her movement from side to side, causing headaches and neck aches.  AR101.  She testified that her left hand/arm was fine, but her right one was beginning to have some issues when she tried to do some things on her computer at home.  AR102.  Ms. Clarambeau testified that her carpal tunnel surgery was relatively successful. AR102.

**2.     Vocational Expert Testimony**

The ALJ asked the vocational expert ("VE"), an initial hypothetical question that mirrored the limitations included in the RFC determined by the ALJ, and the VE testified that the individual would be able to perform past work in occupations of accounting clerk, travel agent, and receptionist job as described in the Dictionary of Occupational Titles ("DOT").  AR104.  In

response to a second hypothetical question, the VE testified that if the person was further limited due to chronic pain so they were limited to jobs involving only simple, routine and repetitive tasks, the person would be unable to perform any of the identified past work, and they would not be able to transfer any of the acquired skills.  AR105.

In response to a third hypothetical question, the VE testified that a person described in the initial hypothetical (who was not limited to only simple, routine and repetitive tasks by pain), but did require a sit/stand option where she could sit half an hour and then stand and walk half an hour and repeat in this fashion, would not be able to perform any of the identified past work, and the person would not be able to transfer any acquired skills.  AR105-06.  The VE testified that if the individual could sit for half an hour and stand up, move around for a few minutes, and return to sitting, she would be able to perform the past relevant work in the first hypothetical question.  AR106.

**F.      Disputed Facts.**

The following statements of fact were proposed by plaintiff and objected to by the defendant.

1.      Ms. Clarambeau's ALJ hearing lasted 29 minutes.

The defendant objected to this because it is not the most "objective" fact from the transcript.  Defendant proposed listing the hearing's start and end time.

2.      In Step 3, the ALJ did not expressly mention fibromyalgia, or obesity, or whether Ms. Clarambeau's fibromyalgia and/or obesity were

31

medically equivalent, either separately or in combination with her other impairments, to any Listing in the Step 3 evaluation.  AR26.

The defendant objected to this because it is not something specifically stated in the decision.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Biestek v. Berryhill, 587 U.S. ___, 139 S. Ct. 1148, 1154 (2019); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion.  Biestek, 139 S. Ct. at 1154;  Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action."  Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an

opposite decision.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).   The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.

**B.   The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his previous work, or any

other substantial gainful activity which exists in the national economy.  42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is

disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB

applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R.

§ 404.1520.  The five steps are as follows:

> **Step One**:  Determine whether the applicant is presently engaged
> in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the
> applicant is engaged in substantial gainful activity, he is not
> disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or
> combination of impairments that are *severe*, i.e. whether any of the
> applicant's impairments or combination of impairments
> significantly limit his physical or mental ability to do basic work
> activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment
> or combination of impairments the applicant is not disabled and
> the inquiry ends at this step. NOTE: the regulations prescribe a
> special procedure for analyzing mental impairments to determine
> whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821
> (8th Cir. 1992); 20 C.F.R. § 1520a.  This special procedure
> includes completion of a Psychiatric Review Technique Form
> (PRTF).
>
> **Step Three**: Determine whether any of the severe impairments
> identified in Step Two meets or equals a "Listing" in Appendix 1,
> Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment
> meets or equals a Listing, the applicant will be considered disabled
> without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320
> n.2 (8th Cir. 1985).  This is because the regulations recognize the
> "Listed" impairments are so severe that they prevent a person from
> pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458,
> 460, (1983).  If the applicant's impairment(s) are *severe* but do not
> meet or equal a *Listed impairment* the ALJ must proceed to step
> four.  NOTE: The "special procedure" for mental impairments also
> applies to determine whether a severe mental impairment meets or
> equals a Listing.  20 C.F.R. § 1520a(c)(2).
>
> **Step Four**: Determine whether the applicant is capable of
> performing past relevant work (PRW).  To make this determination,

the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 1520(f).

## C.  Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.     The Parties' Positions**

Ms. Clarambeau asserts the Commissioner erred in three ways: (1) by failing to properly evaluate whether she met or equaled a listing at Step 3 of the sequential analysis; (2) by failing to evaluate her subjective symptoms; and (3) by failing to properly determine her RFC.[3]

The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.  Ms. Clarambeau's assignments of error are discussed below.

**1.     Whether the Commissioner Properly Determined Whether Ms. Clarambeau Met or Equaled a Listing at Step 3 of the Sequential Analysis**

Step 3 of the sequential evaluation requires the ALJ to determine whether any of the claimant's severe impairments, alone or in combination, meets or equals an impairment that is listed at 20 C.F.R. Part 404, Subpart P, App. 1 (a "Listing").  See 20 C.F.R. § 404.1520(d).  If any such impairment or combination of impairments meets or medically equals a Listing, a finding of disability is automatic.  Id.; Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003).  If the claimant has an impairment that is not among the Listings, the Commissioner is instructed to compare the claimant's findings to a "closely analogous" listed impairment.  See 20 C.F.R. § 404.1526(b)(2).   The non-listed impairment is medically equivalent to a listed impairment if it is equal in severity and duration to a listed impairment.  20 C.F.R. § 404.1526(a).

---

[3] This assignment of error is separated into two sub-parts.

Fibromyalgia is not a Listed impairment.  Ms. Clarambeau asserts, however, that the ALJ should have found her fibromyalgia to be of Listing level.  Ms. Clarambeau asserts the ALJ failed to properly evaluate her fibromyalgia impairment at Step 3 of the analysis because it failed to properly apply Social Security Ruling (SSR) 12-2p.[4]  Specifically, Ms. Clarambeau asserts that under SSR 12-2p, the ALJ was required to evaluate whether her fibromyalgia was medically equivalent to  Listing § 14.09D (inflammatory arthritis)—or if not that Listing, whichever other Listing was most analogous.  The ALJ's written decision, Ms. Clarambeau asserts, reveals it did not compare her fibromyalgia to any other specific Listing, which was error.

Social Security Ruling 12-2p instructs the Social Security Administration how to develop evidence in cases where a claimant alleges fibromyalgia as one of their medically determinable impairments.  Part of the SSR includes instruction to the SSA on how to evaluate fibromyalgia claims at Step 3 of the 5-step sequential evaluation process (the Listings).  The SSR states, in relevant part:

VI.    How do we consider FM in the sequential evaluation process?

_____

[4] In brief, the Commissioner asserts that Ms. Clarambeau also claims the ALJ should have evaluated whether her obesity met or equaled a Listing level impairment pursuant to SSR 19-2p (rescinded and replaced with SSR 02-01p, effective May 20, 2019).  The court does not interpret Ms. Clarambeau's argument to make such a claim.  Instead, the court interprets Ms. Clarambeau's argument to state that had the ALJ properly considered whether fibromyalgia met or equaled a Listing pursuant to SSR 12-2p, her obesity would have been part and parcel of that consideration.

As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with an MDI of FM is disabled.

> \*\*\*
> C.      At Step 3, we consider whether the person's impairment(s) meets or medically equals the criteria of any of the listings in the Listing of Impairments in appendix 1, subpart P, of 20 CFR part 404 (appendix 1).  FM cannot meet a listing in appendix 1 because FM is not a listed impairment.  At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment.

See SSR 12-2p at Section VI.C.

Because there is no Listing for fibromyalgia, therefore, Ms. Clarambeau asserts the ALJ should have, but did not, analyze whether her fibromyalgia met or equaled Listing § 14.09D as the basis for an award of disability benefits at Step 3.

Listing § 14.09D requires that Ms. Clarambeau show (1) inflammatory arthritis as described in listing 14.00D6 and (2) repeated manifestations of inflammatory arthritis, with at least *two* constitutional symptoms (severe fatigue, fever, malaise, or involuntary weight loss), and *one* of the following at the *marked* level: (a) limitation of activities of daily living, (b) limitations in maintaining social functioning, or (c) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  See Listing § 14.09D.

To satisfy the first prong of the test for Listing § 14.09D, Ms. Clarambeau must satisfy the listing for inflammatory arthritis found at listing 14.00D6. This listing covers a "vast array of disorders that differ in cause, course, and

outcome." See Listing § 14.00D6.  Subpart 6(e)(ii) of Listing § 14.00D states that listing-level severity is shown in Listing § 14.09D "by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs.  Extra-articular impairments may also meet listings in other body systems."  Id.  In subpart 6(e)(iii), Listing § 14.00D6 goes on to state that "extra-articular" inflammatory arthritis features may involve any body system, including musculoskeletal, ophthalmologic, pulmonary, cardiovascular, renal, hematologic, neurologic, mental, and immune system.  Id.

To satisfy the second prong of the test for Listing § 14.09D, four showings must be made: (1) repeated manifestations of inflammatory arthritis as described above, (2) & (3) two of the listed symptoms and (4) one of the listed limitations at the "marked" level. Id.  The evaluation of whether Ms. Clarambeau meets or equals the listing at § 14.09D should be made in the first instance by the ALJ.  The ALJ did not consider Listing § 14.09D in its analysis and there are many unanswered questions about the applicability of that Listing to Ms. Clarambeau's impairments that should be answered first by the ALJ.

Fibromyalgia *was* presented by the record, and the ALJ acknowledged it was a severe impairment.  Because it was acknowledged as a severe impairment and did not meet or equal any other Listed impairment, the ALJ should have analyzed it under Listing § 14.09 pursuant to SSR 12-2p.

39

The Commissioner asserts that because the ALJ evaluated
Ms. Clarambeau's physical impairments under Listings § 1.04 (disorders of the
spine) and § 1.02 (major dysfunction of a joint), its failure to perform the
analysis as to fibromyalgia under § 14.09D is harmless.  This is so, argues the
Commissioner, because the ALJ's analysis under § 14.09D would have had the
same result as it did under the Listings for Ms. Clarambeau's other two severe
physical impairments, because the ALJ made findings sufficient to preclude a
§ 14.09D Listing based upon its finding that Listings 1.04 and 1.02 were not
met.[5]

A careful reading of the ALJ's Step 3 analysis, however, requires the
court to reject this argument.  The Step 3 analysis requires the ALJ to
determine whether an impairment *or combination of impairments* meets or
equals a Listing.  As for the ALJ's analysis of whether fibromyalgia met or
equaled a Listing, the ALJ stated "the claimant does not have an impairment or
combination of impairments that meets or medically equals the severity of any
one of the *listed impairments* in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)."
(Emphasis added).   As discussed above, fibromyalgia is *not* a Listed

---

[5] In brief, the Commissioner does not specifically cite Listings 1.02 and
1.04, but instead argues the ALJ "identified two listed impairments that were
closely analogous to Plaintiff's medically determinable impairments."  Docket
16, p. 7.  But in its written discussion, the ALJ did not state that it was
comparing those two impairments to fibromyalgia for purposes of determining
whether Ms. Clarambeau's *fibromyalgia*, alone or in combination with her other
impairments, was of Listing level severity.  Fibromyalgia was never mentioned
at all within the ALJ's Listing discussion.

impairment.  And, the ALJ did not mention or discuss whether it considered fibromyalgia *in combination with* the specifically Listed impairments under consideration when determining whether those Listed impairments met or equaled the Listing requirements.

This leaves the court unable to determine whether the ALJ properly considered Ms. Clarambeau's severe fibromyalgia impairment *at all* at the Step 3 level of the sequential evaluation.  The court is therefore likewise unable to discern whether fibromyalgia was among the impairments or "combination of impairments" that was considered *at all* at this Step.

When the court is unable to determine how the ALJ evaluated fibromyalgia at Step 3, the matter must be remanded.  The district courts in this district have consistently interpreted SSR 12-2p to require as much.   See e.g. Wheeler v. Berryhill, 2017 WL 4271428 at **3-4 (D.S.D. Sept. 26, 2017); Sunderman v. Colvin, 2017 WL 473834 at *7 (D.S.D. Feb. 3, 2017); and Jockish v. Colvin, 2016 WL 1181680 at *7 (D.S.D. Mar. 25, 2016).

In each of these cases, the district court remanded for the ALJ's failure to evaluate at Step 3 whether the claimant's fibromyalgia met or equaled a Listing by comparing it to Listing 14.09D—as instructed in SSR 12-2p.  Wheeler, 2017 WL 4271428 at **3-4; Sunderman, 2017 WL 473834 at *7; and Jockish, 2016 WL 1181680 at *7.

In <u>Wheeler</u>, the court explained,

> It is clear the Social Security Administration intended an ALJ to evaluate fibromyalgia under Listing 14.09D. "Social Security Regulations . . . 'are binding on all components of the Administration.' " <u>Carter v. Sullivan</u>, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 422.408)). The "agency's failure to follow its own binding regulations is a reversible abuse of discretion." <u>Id.</u> The ALJ's finding cannot be sustained because an error of law occurred.

<u>Wheeler</u>, 2017 WL 4271428 at *4. In this case, as in <u>Jockish</u>, <u>Sunderman</u>, and

<u>Wheeler</u>, it is impossible for this court to analyze whether the ALJ's reasoning

regarding medical equivalence is sound. <u>Wheeler</u>, 2017 WL 4271428 at *4.

For this reason, this case must be remanded for a proper Step 3 analysis

pursuant to SSR 12-2p.

### 2. Whether the Commissioner Properly Evaluated Ms. Clarambeau's Subjective Symptoms[6]

In determining whether to fully credit a claimant's subjective complaints

of disabling pain, the Commissioner engages in a two-step process: (1) first, is

there an underlying medically determinable physical or mental impairment

that could reasonably be expected to produce the claimant's symptoms; and

---

[6] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy. <u>See</u> SSR 16-3p (which superseded SSR 96-7p). The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. <u>Id.</u> The court uses the term "credibility" herein only to the extent necessary as it is prevalent in the case law that has developed. The ALJ in this case did not use the term "credibility" but instead explained Ms. Clarambeau's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR27.

(2) if so, the Commissioner evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work.  See SSR 16-3p;[7] 20 C.F.R. § 404.1529.[8]  Here, the ALJ found Ms. Clarambeau had medically determinable physical impairments that could reasonably be expected to produce her symptoms in accordance with part one above.  AR27.  So, the analysis rested on the second prong discussed above.

In evaluating the second prong of the analysis, an ALJ must consider several factors.  The factors to consider include:  whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Polaski, 739 F.2d at 1322).  The objective medical evidence is not the only consideration, and the claimant's subjective complaints may not be disregarded solely because they are not supported by the objective medical

---

[7] This Social  Security Ruling generally interprets how to evaluate symptoms in disability claims.

[8] 20 C.F.R. § 404.1529 is a rough codification of the factors discussed in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

evidence. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). If adequately supported, credibility findings are for the ALJ to make. Black, 143 F.3d at 386. Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations

so long as they are supported by substantial evidence and good reasons.  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

The Eighth Circuit has said "in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Woolf, 3 F.3d at 1213.  So too, here:  there is no question Ms. Clarambeau experienced symptoms; the real issue is how severe those symptoms are.  The Polaski factors should assist the ALJ in making that determination.

Though the ALJ stated it evaluated Ms. Clarambeau's subjective pain complaints pursuant to the requirements of SSR 16-3p and 20 C.F.R. § 404.1529, a close reading of its decision reveals otherwise.  Instead the ALJ actually gave weight to *only one* of the factors found in Polaski and 20 C.F.R. § 404.1529—the objective medical evidence.  The ALJ's discussion is found at AR27-34.  The ALJ stated it had considered "other evidence" in compliance with 20 C.F.R. § 404.1529.  AR27.  The ALJ's discussion, however, contained no *substantive* analysis of any factor other than the objective medical evidence.

The ALJ began by explaining that Ms. Clarambeau's "symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." AR27.  The entirety of AR28 and a portion of AR29 consists of the ALJ's description of Ms. Clarambeau's statement about her symptoms and abilities, as well as the statements

45

submitted by two of Ms. Clarambeau's acquaintances.  AR28-29.  The ALJ
simply stated that "these statements were considered in making this
decision."  AR29.

Next, the ALJ stated "the objective evidence is not consistent with the
severity of the claimant's alleged symptoms related to physical impairments.
The claimant appeared to sit comfortably during the hearing and did not need
to stand.   She talked in a very fluent manner."  AR29.  Ms. Clarambeau
testified that she could sit for three or four hours before she needed to get up
and walk around.  AR97.  The administrative hearing began at 9:57 a.m. and
ended at 10:26 a.m., for a duration of twenty-nine minutes.  AR88, 107.
She did not testify she could not speak fluently.  That she could "sit
comfortably" and "talk in a fluent manner" during her twenty-nine minute
hearing, therefore, does not appear to be inconsistent with her testimony or her
function report, in which she likewise did not indicate an inability to sit for
twenty-nine minutes or to speak fluently.  See AR368-78.

Next, the ALJ undertook a lengthy discussion of Ms. Clarambeau's
medical treatment, and of the medical opinion evidence in the file.[9]  AR29-34.
Within that discussion, the ALJ mentioned a few of the other factors such as
Ms. Clarambeau's medications, and whether Ms. Clarambeau indicated to her
physicians that she perceived the various medical treatments and medications
they had provided to her had been effective to improve her pain symptoms.  Id.

---

[9] Ms. Clarambeau has cited the ALJ's evaluation of the medical opinion
evidence as a separate point of error (3.b), below.

In its brief, the Commissioner holds up some of these citations to the medical evidence as examples of how the ALJ properly evaluated the <u>Polaski</u> factors.   The problem is *the ALJ* did not "connect the dots" to explain how its regurgitation of these topics weighed upon its finding about Ms. Clarambeau's subjective pain complaints.  In brief, *the Commissioner* attempts to make this connection after the fact by citing much of the evidence counsel believes supports the ALJ's decision that Ms. Clarambeau's description of her symptoms was not entirely consistent with the record as a whole.  <u>See</u> Docket 16, pp. 10-12.  Following its citation of the evidence which the ALJ recited in its decision, the Commissioner *in brief* completes the circle by citing regulation or authority explaining why the ALJ properly *could have* relied upon such evidence to find Ms. Clarambeau's allegations of pain not entirely inconsistent with the record.

For example, the Commissioner cites the ALJ's recitation of Ms. Clarambeau's activities of daily living, followed by *the Commissioner's* statement that "these substantial daily activities are not consistent with plaintiff's allegations of total disability.  <u>See</u> <u>Johnson v. Shalala</u>, 24 [sic][10] F.3d 448, 451 (8th Cir. 1994) (ability to read, watch television, drive, grocery shop, cook, wash, dishes, garden, and visit with children contradicted allegations of disabling pain); 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (activities of daily living)."  <u>See</u> Docket 16, p. 10. (Commissioner's brief).  But compare the ALJ's decision, AR28.  In the ALJ's decision, the ALJ simply recited some of

_____

[10] The correct citation to this case is <u>42</u> F.3d 445, 451, (8th Cir. 1994).

Ms. Clarambeau's activities of daily living without commenting at all about what, if any, conclusions the ALJ drew from that evidence as to why her allegations of pain were consistent or inconsistent with it.  Id.

The Commissioner in brief likewise offered post-hoc rationalization regarding the ALJ's citation of evidence regarding Ms. Clarambeau's medications and medical treatment.  See Docket 16, p. 11.  The Commissioner explained in brief that the ALJ properly considered Ms. Clarambeau's medical treatment other than medication for relief of pain. The Commissioner cites Milam v. Colvin, 794 F.3d 978, 985 (8th Cir. 2015) and 20 C.F.R. §§ 404.1529(c)(3)(iv); 416.929(c)(3)(iv) for the proposition that the ALJ properly considered that a conservative treatment history undermined a claim of disabling pain.

But when the ALJ discussed Ms. Clarambeau's medical treatment (AR30-31), the ALJ did *not* state that her conservative treatment history undermined her claim of disabling pain.  Id.  The ALJ noted that conservative treatment was *recommended for her ongoing low back pain* (AR31). Even making the assumption the Commissioner proffers as to the ALJ's conclusion regarding the connection to be drawn between Ms. Clarambeau's course of treatment and its consistency with her claim of disabling pain, this court questions whether her treatment history, which included a previous low back surgery and nerve ablation surgery (AR733-34; 737-39; 744-46; 751-53; 1010-11; 1030-36) could be considered a conservative course of care as the Commissioner suggests.

48

The point is, the ALJ did not state as much in its written decision as a reason for denying benefits.

In brief, the Commissioner also noted the ALJ had cited (AR29) that Ms. Clarambeau had worked with her fibromyalgia condition for years.  The ALJ stated Ms. Clarambeau had "worked with fibromyalgia for years; she managed her fibromyalgia with diet."  AR29.  In brief, the Commissioner cites Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990), and Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992), along with 20 C.F.R. § 404.1529(c)(3)(vii) for the proposition that the ALJ properly considered this as an "other factor" indicating that Ms. Clarambeau's fibromyalgia is not disabling.  The *ALJ*, however, said nothing in its decision to elucidate that it had drawn such a conclusion by citing the evidence that she had managed her fibromyalgia with her diet for years.

Finally, in brief the Commissioner notes the ALJ cited Ms. Clarambeau's job ended at POET after she was injured and could no longer physically perform her duties as a custodian.  In fact, she was terminated by POET because they had no jobs available for her which were compatible with the physical restrictions imposed by her physicians. AR406.  Ms. Clarambeau thereafter worked with the South Dakota Department of Human Services vocational rehab department to attempt to find other, part-time employment. See Docket 16, pp.11-12 (citing AR28-29).

In brief, the Commissioner argues that because Ms. Clarambeau continued to seek work after she was terminated from her job at POET, the ALJ

49

properly considered her job-seeking activities as inconsistent with her pain allegations.  See Docket 16, pp. 11-12.  Again, however, if the ALJ did weigh the circumstances of Ms. Clarambeau's departure from POET and her work with the Department of Human Resources as being inconsistent with her allegations of pain, it gave no such indication in its decision.  See AR29.  After discussing these facts, the ALJ simply stated "these statements were considered in making this decision."  Id.

In Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962), the Supreme Court addressed this issue.  The Court noted the Administrative Procedures Act allows courts to determine whether agencies have properly exercised their discretion within the bounds expressed by the legislative delegation of power.  Id. at 167-68.  In order for courts to make this determination, the *agency* must "disclose the basis of its order."  Id. at 168 (emphasis added).  "The agency must make findings and support its decision, and those findings must be supported by substantial evidence."  Id.  Where the agency did not express a particular rationale for its decision, and counsel on appeal supplied a rationale, the Court rejected counsel's *post hoc* rationale because it was never expressed by the agency in its decision.  Id.  "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action; Chenery requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself."  Id. at 168-69.

In its written decision in his case, the ALJ did nothing more than regurgitate the raw facts from the administrative record.  The court appreciates

that the Commissioner in brief has gone to the effort to guess what the ALJ might have been thinking and then fill in the blanks for the court as far as how the ALJ may have viewed those raw facts.  But that is not for the Commissioner, or for the court, to do.

The court can read the administrative record for itself.  In the absence of an explanation from the *ALJ* as to how it reached its conclusions, this court is unable to make a proper review of the agency decision.  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011) ("The reviewing court will not speculate on what basis the Commissioner denied a social security disability claim.").

The bulk of the ALJ's discussion at AR29-32 consists of a review of Ms. Clarambeau's medical treatment.  This discussion, however, is likewise devoid of analysis regarding how the medical treatment Ms. Clarambeau received correlates to the ALJ's determination that Ms. Clarambeau's subjective pain complaints were "not entirely consistent" with the evidence as a whole. The final sentence of the section wherein the ALJ analyzed Ms. Clarambeau's subjective pain complaints succinctly states, (referring to a review of her medical records) "the claimant had ongoing treatment for pain and back problem[s], but she consistently had normal physical examinations with full strength and normal gait."  AR34.   But, as explained above, the objective medical evidence is not the only consideration, and the claimant's subjective complaints may not be disregarded *solely* because they are not supported by the objective medical evidence.  Goff, 421 F.3d at 792.  Ms. Clarambeau's subjective complaints of pain may be discredited only if they are inconsistent

51

with the evidence as a *whole*.  Black, 143 F.3d at 386.  Remand is required to determine if that requirement was met in this case.

### 3.    Whether the Commissioner's Determination of Ms. Clarambeau's RFC is Supported by Substantial Evidence

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."  Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[11]  Lauer, 245 F.3d at 703 (citations

---

[11] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight."  Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  Id. at n. 8.  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

---

of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  SSR 96-8p.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of

the physician.  Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008).  Nor may
the ALJ "play doctor" or rely on its own interpretation of the meaning of the
medical records.  Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were reaffirmed in Combs v. Berryhill, 878 F.3d 642,
647 (8th Cir. 2017).  In Combs, the claimant alleged disability as a result of
combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and
obesity.  Id. at 643.  The only medical opinions in the file regarding Ms. Combs'
RFC were from two state agency physicians who had never treated or examined
Ms. Combs.  Id. at 644.  Those physicians instead based their opinions on their
review of Ms. Combs' medical records.  They gave differing opinions as to
Ms. Combs' RFC (one opined she was capable of light duty work, while the
other opined she was capable of only sedentary work).  Id. at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective
complaints not entirely credible based upon the ALJ's own review of her
medical records and notations therein which indicated she was in "no acute
distress" and that she had "normal movement of all extremities."  Id.  The state
agency physicians apparently did not base their opinions on these
observations.  Ms. Combs asserted the ALJ should have contacted the
physicians for clarification of what the notations meant rather than rely upon
its own inferences.  Id. at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its
own inferences as to the relevance of the two phrases "no acute distress" and
"normal movement of all extremities" as it was significant to her conditions.  Id.

at 647.  The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion.  Id.  So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record.  Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations.  That ruling contains requirements for the ALJ's narrative discussion.  One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ."  Id. at p. 13.  Another is that "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  Id. at p. 14.

The ALJ formulated Mr. Clarambeau's RFC as follows:

> The claimant has the residual functional capacity to perform sedentary work . . . except the claimant can stand/walk three hours total in an eight-hour workday; can never climb ladders, scaffolds or similar devices; can occasionally climb stairs; can occasionally balance, stoop, kneel, crouch, or crawl; can frequently handle and finger bilaterally; and should avoid concentrated exposure to hazards such as unprotected heights or fast and dangerous machinery.

AR27.  Ms. Clarambeau asserts the ALJ's formulation of her RFC is not supported by substantial evidence for two reasons, discussed below.

56

### a.   Whether the Commissioner Properly Determined the Limitations from Ms. Clarambeau's Fibromyalgia

Ms. Clarambeau asserts the ALJ failed to properly acknowledge the limitations presented by her fibromyalgia, which the ALJ recognized was a severe impairment.  The Social Security Administration has published a ruling[12] (SSR 12-2p) regarding how to administer cases in which one of the claimant's medical impairments is fibromyalgia.  Ms. Clarambeau posits that the ALJ neither acknowledged the existence of SSR 12-2p in its opinion, nor applied it.  Ms. Clarambeau claims the ALJ failed to properly apply SSR 12-2p because the ALJ did not properly determine whether fibromyalgia presented limitations which should have been incorporated into her RFC.

Ms. Clarambeau asserts the ALJ's failure to properly apply SSR 12-2p is made obvious by its focus on the "objective" or "normal" medical examinations and test results, rather than the symptoms that are associated with fibromyalgia, which is contrary to the instruction provided by SSR 12-2p.  See e.g. AR29-34 (ALJ discusses lack of objective evidence to support her claims, "mostly normal" physical exams which the ALJ mentioned at least ten times throughout its decision).

These repeated references to normal exam results rather than the various symptoms which can be associated with fibromyalgia, asserts

---

[12] Social Security rulings do not have the same force and effect as laws or regulations, but they are binding on all components of the SSA and are used to adjudicate Social Security disability cases.  See https://www.disability-benefits-help.org/glossary/social-security-rulings.  (All internet citations in this opinion last checked on June 11, 2020).

Ms. Clarambeau, indicate the ALJ really did not understand the nature of fibromyalgia.  Instead, Ms. Clarambeau argues, the ALJ should have done what SSR 12-2p mandates, which is to examine the record for "widespread pain and other symptoms *associated* with FM" which may result in exertional and nonexertional limitations.  See SSR 12-2p, Section VI(E)(1) (emphasis added). These associated symptoms can include widespread pain and chronic fatigue, cognitive memory problems ('fibro fog"), waking un-refreshed, depression, anxiety disorder, irritable bowel syndrome, irritable bladder syndrome, interstitial cystitis, TMJ disorder, reflux disorder, migraines, and restless leg syndrome.  See SSR 12-2p, Section II (B)(2).

The Commissioner responds that the ALJ properly determined the limitations (or lack thereof) presented by Ms. Clarambeau's fibromyalgia and incorporated them into her RFC.  The Commissioner argues the record shows Ms. Clarambeau's fibromyalgia was controlled by her medical treatment because her "medical records did not substantiate widespread pain, chronic fatigue, cognitive memory problems, 'fibro-fog,' waking unrefreshed, irritable bowel syndrome, irritable bladder syndrome, interstitial cystitis, TMJ, reflux disorder, migraines, restless leg syndrome, or severe mental impairments."  See Docket 16, p. 22.  The Commissioner argues that because the ALJ acknowledged fibromyalgia as a severe impairment, it fulfilled its duty.

The Eighth Circuit has noted that fibromyalgia is a disease which is "chronic, and diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests . . . We have long recognized that

fibromyalgia has the potential to be disabling." <u>Forehand v. Barnhart</u>, 364 F.3d 984, 987 (8th Cir. 2004) (citations omitted, punctuation altered).

Where the ALJ rejected a claimant's fibromyalgia symptoms and complaints because they were not "substantiated by objective medical testing" the Eighth Circuit reversed and remanded the case because the ALJ "misunderstood fibromyalgia" which likewise adversely affected the ALJ's formulation of the claimant's RFC analysis. <u>Garza v. Barnhart</u>, 397 F.3d 1087, 1089 (8th Cir. 2005).

> Fibromyalgia is defined as a syndrome of chronic pain of musculoskeletal origin but uncertain cause. <u>Stedman's Medical Dictionary</u>, at 671 (27th ed. 2000). Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." <u>Harrison's Principles of Internal Medicine</u>, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." <u>Stedman's Medical Dictionary</u>, <u>supra</u>.

<u>Johnson v. Astrue</u>, 597 F.3d 409, 410 (1st Cir. 2010).

In <u>Johnson</u>, the treating physician's opinion regarding the claimant's fibromyalgia and its effect on her ability to work was not given controlling or even significant weight. <u>Johnson</u>, 597 F.3d at 412. In <u>Johnson</u>, the ALJ rejected the treating physician's opinion because it relied primarily upon the claimant's subjective complaints and lacked supporting objective medical findings. <u>Id.</u> Because of the unique nature of fibromyalgia, however, the First Circuit criticized the ALJ's reasons for giving little weight to the treating physician's opinion:

> Dr. Ali's "need" to rely on claimant's subjective allegations . . . was not the result of some defect in the scope or nature of his examinations nor was it even a shortcoming.  Rather, "a patient's report of complaints, or history, is an essential diagnostic tool" in fibromyalgia cases, and a treating physician's reliance on such complaints "hardly undermines his opinion as to [the patient's] functional limitations."  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation and citation omitted).  Further, since trigger points *are* the only "objective" signs of fibromyalgia, the ALJ "effectively [was] requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines," and this, we think, was error.

Id. at 412 (emphasis in original).  The court concluded by finding the RFC formulated by the ALJ was "significantly flawed."  Id.

In Rogers v. Commissioner of Soc. Security, 486 F.3d 234, 250 (6th Cir. 2007), the Sixth Circuit likewise reversed and remanded a fibromyalgia case. "[U]nlike medical conditions that can be confirmed by objective medical testing, fibromyalgia patients present no objectively alarming signs. . . [F]ibromyalgia is an elusive and mysterious disease which causes severe musculoskeletal pain . . . [F]ibromyalgia patients manifest normal muscle strength and neurological reactions and have a full range of motion."  Id. at 243-44 (citations omitted, punctuation altered).  The Rogers court held the ALJ erred by adopting into the RFC opinions of physicians who dismissed the claimant's complaints because they were not substantiated by objective findings.  Id. at 244-46.  "[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely on objective evidence are not particularly relevant."  Id. at 245.

This court has carefully read the ALJ's evaluation of Ms. Clarambeau's fibromyalgia symptoms.  The ALJ stated, "She worked with fibromyalgia for several years; she managed her fibromyalgia with diet.  The claimant had only tenderness and some decreased ROM, but full strength and normal gait." AR29.  The ALJ continued with this paragraph in which fibromyalgia is frequently mentioned, but "normal" exams are emphasized by the ALJ:[13]

> The claimant continued having mostly normal physical examinations throughout 2017, but she had diffuse tenderness consistent with her fibromyalgia.  She continued various injections, but surgery was not recommended.  Imaging showed no significant neural compromise in the lumbar spine and her symptoms were attributed to piriformis dysfunction and myofascial pain.  The claimant continued trying to exercise as possible and work on her weight loss.  In June, 2017, the claimant was treated for low back pain and right hip pain.  She easily arose from a seated position and demonstrated a fairly normal gait with a slight limp on the right side.  She bend [sic] forward fairly well, but complained of pain in the right SI area.  She had negative straight leg raise.  She had diffuse tenderness throughout her back consistent with her fibromyalgia.  She had good lower extremity ROM.  The claimant was diagnosed with right sacroiliitis and SI joint dysfunction; she had a history of lumbar surgery and multilevel lumbar degenerative disc disease (DDD).  The claimant had fibromyalgia and morbid obesity.  A repeat SI joint injection was recommended [AR799].  Conservative treatment for her low back was recommended and surgical intervention was not recommended.  [AR936-45].  She was evaluated with pain management.  The claimant had a mostly normal physical examination, but she had allodynia and dysesthesias over the left anterolateral thigh.  The claimant was diagnosed with left meralgia paresthetica.  AR946.  The next month, she had a right SI joint injection.  [AR807].  She lost weight; she was exercising as much as possible, but infrequently.  Her mother was recently moved to a nursing home and the claimant was getting used to that change.  She was in no acute distress.  The claimant was to continue weight

---

[13] Within its decision, the ALJ cited to exhibits within the administrative record by Exhibit number and page number.  For ease of reference and continuity, the court has translated those references in this opinion into the AR page numbers as they now appear in the record.

loss modification; her pain medications were renewed.  She was
encouraged to push her activity level [AR970].  She was in no acute
distress in late 2017 [AR982].  The claimant was referred to
physical therapy. [AR957].  It was noted that imaging showed no
significant neural compromises in the lumbar spine.  Her
symptoms were attributed mostly to piriformis dysfunction and
myofascial pain; she had a right piriformis injection.  The claimant
had some reduced lumbar ROM and tenderness, but normal hip
ROM and normal gait.  [[AR1059].

AR30-31.

Finally, the ALJ's closing sentence to the section in which it  formulated

Ms. Clarambeau's RFC again emphasized the ALJ's belief that "normal"

physical exams, even when one of the severe impairments is fibromyalgia,

equaled no disability:  "…[T]he claimant had ongoing treatment for pain and [a]

back problem, but she consistently had mostly normal physical examinations

with full strength and normal  gait."  AR34.

As in Garza, Johnson, and Rogers, it appears the ALJ in this case

effectively required objective evidence in order to credit her associated pain

symptoms of fibromyalgia.  As such, the ALJ misunderstood Ms. Clarambeau's

fibromyalgia and as a result, it rejected associated limitations which may have

been necessary in her RFC.  Accordingly, the ALJ's formulation of the RFC was

"significantly flawed" and this case should be reversed and remanded for

further consideration. Johnson, 597 F.3d at 412; Rogers, 486 F.3d at 243-44;

and Garza, 397 F.3d at 1089.

### b.   Whether the Commissioner Properly Evaluated the Medical Opinion Evidence

Finally, Ms. Clarambeau asserts the RFC is flawed because the ALJ

failed to properly weigh the medical opinion evidence.  There were several

medical opinions in Ms. Clarambeau's administrative file.  The ALJ's assessment of the medical opinions is found at AR32-33.  The opinions, and the weight assigned to them by the ALJ, are summarized below:

**Rebecca Studelska, Chiropractor**, submitted a letter indicating Ms. Clarambeau reported pain with household chores.  Dr. Studelska opined Ms. Clarambeau would have difficulty with carrying and lifting objects and with twisting actions such as sweeping, vacuuming, and mopping.  She indicated Ms. Clarambeau had no concerns with sitting or standing.  Dr. Studelska based her opinions upon what she could remember from treating Ms. Clarambeau a year earlier, and assumed Ms. Clarambeau's functioning had not changed.  [AR476].  The ALJ assigned Dr. Studelska's opinions *little weight* because they did not provide specific limitations and because they were assumptions made on past treatment.  Additionally, the ALJ noted, chiropractors are not acceptable medical sources.  AR32.

**Corey Rothrock, M.D.** submitted a letter opinion in May, 2017.  Dr. Rothrock indicated Ms. Clarambeau could return to work, but could lift no more than 10 pounds and could stand/sit for no more than 4 hours.  [AR897].  The ALJ assigned Dr. Rothrock's opinions *some weight* because they were based upon Dr. Rothrock's treatment of Ms. Clarambeau and because she had ongoing tenderness and reported pain symptoms.  However, to the extent that Dr. Rothrock opined Ms. Clarambeau was not capable of sitting for at least 6 hours, the ALJ gave Dr. Rothrock's opinions *less weight* "because the records support a finding that the claimant can perform a range of sedentary work.  She cared for her ailing mother and the claimant engaged in exercise as possible for weight loss."  AR32.

**James Brunz, M.D.** submitted an opinion in June, 2018.       Dr. Brunz opined Ms. Clarambeau could lift/carry 10 pounds frequently, sit/stand/walk for 4 hours in an 8-hour workday, and could rarely stoop, occasionally climb ladders or scaffolds or crouch.  She could frequently climb ramps and stairs, balance and kneel.  She could frequently reach, finger or feel.  She should avoid concentrated exposure to vibration or hazards.  These limitations had been present since at least May, 2017.  [AR1102-04].  Dr. Brunz also noted Ms. Clarambeau's current symptoms could prevent her from performing more physical activities due to her likely limitations with bending, twisting, and lifting.  [AR1105].  In August, 2018, Dr. Brunz noted Ms. Clarambeau had no

improvement with some of the treatment he had provided, but had improved with other treatment he had provided.  Due to Ms. Clarambeau's ongoing pain, Dr. Brunz opined she would be precluded from medium to heavy work on a full-time basis. [AR1110].  The ALJ afforded these opinions **some weight** because they were based upon Dr. Brunz' treatment of Ms. Clarambeau. AR32.  The ALJ stated,  "the more recent opinions support this decision, but are given **less weight** because they do not provide specific functional limitations.  The earlier opinion that the claimant could perform a range of sedentary work are given **some weight**, but the opinion that the claimant could not stand/walk for six hours and could only rarely stoop are given **less weight**. Although the claimant had ongoing treatment for her back problems and pain, she consistently had mostly normal physical examinations."  AR32-33.

**Nate Timmer, M.D.** submitted an opinion in June, 2018. Dr. Timmer stated Ms. Clarambeau was not disabled because she had not tried all possible treatments and had frequently missed physical therapy.  [AR1099-1101].  In early 2018, Dr. Timmer stated Ms. Clarambeau was not disabled, but would have ongoing back pain. [AR983].  The ALJ noted that Dr. Timmer's opinions "support this decision but they are given little weight because they do not provide specific functional limitations and 20 C.F.R. § 404.1527(d) . . . state[s] that opinions as to whether the claimant is disabled or unable to work are by their nature administrative findings and as such reserved for the Commissioner."  AR33.

**Thomas Ripperda, M.D.** submitted opinions in late 2016 and early 2017.  In late 2016, Dr. Ripperda opined Ms. Clarambeau could stand/walk for 3-5 hours and could sit for 3-5 hours out of an 8-hour workday.  He further opined she could lift up to 10 pounds and could lift only occasionally.  She could do simple grasping and fine manipulation, but could not push/pull.  She could not bend, carry, or kneel, but could occasionally use stairs and could frequently reach above shoulder level.  These limitations would last for two months.  In early 2017, Dr. Ripperda opined Ms. Clarambeau could perform sedentary work up to 4 hours per day, but could not lift more than 10 pounds and could not carry or kneel.  She could occasionally bend and use stairs.  She could do simple grasping, fine manipulation, and push/pull up to 15 pounds.  [AR406-08]; [581-82]; [896].  A month or two later, Dr. Ripperda opined Ms. Clarambeau could not lift more than 10 pounds, could sit or stand for 3-5 hours each per day and could occasionally bend, carry, or climb stairs.  She could not kneel and needed frequent position changes [AR632-33]; [AR888].  AR33.

The ALJ assigned Dr. Ripperda's initial opinions **little weight**.  Id.
The ALJ assigned little weight because Dr. Ripperda did not
initially assign functional limitations "over a period of at least 12
months."  Id.  The ALJ assigned Dr. Ripperda's final opinion **some
weight**.  Id.   But Dr. Ripperda's opinions that Ms. Clarambeau
could sit less than 6 hours out of an 8-hour work day and that she
needed to frequently change position were given **little weight** by
the ALJ because Ms. Clarambeau's "symptoms improved with
treatment and except for some tenderness and occasional limited
ROM, the claimant consistently had good physical examinations."
Id.

**State Agency Assessments**.  On March 15, 2017, **Gregory
Erickson, M.D.** reviewed Ms. Clarambeau's records.  AR108-14.
Dr. Erickson concluded Ms. Clarambeau was limited to lifting 10
pounds occasionally and less than 10 pounds frequently, and that
she could stand/walk for 4 hours per day, and sit for more than 6
hours out of an 8-hour workday.  He also concluded
Ms. Clarambeau could relieve her pain from sitting with normal
breaks and lunch periods. AR116-17.  On June 2, 2017, the State
agency medical consultant at the reconsideration level (**James
Barker, M.D.**) reviewed Ms. Clarambeau's records.  AR138-52.
Dr. Barker imposed the same restrictions as had Dr. Erickson
upon initial review, except Dr. Barker indicated Ms. Clarambeau
"must periodically alternate sitting and standing to relieve pain
and discomfort" (AR147) and that she "can relieve pain from sitting
with normal breaks and lunch periods by shifting position as
needed and standing to stretch for one minute each hour when
necessary."  Id.  The ALJ stated the State agency physician
opinions were **given weight** because "they are based on a
thorough review of the records showing the claimant had ongoing
treatment for pain and back problem, but she consistently had
mostly normal physical examinations with full strength and
normal gait."  AR34.

Medical opinions are considered evidence which the ALJ will consider in

determining whether a claimant is disabled, the extent of the disability, and the

claimant's RFC.  See 20 C.F.R. § 404.1527.  All medical opinions are evaluated

according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the
    record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the
     claimant;

--whether the person giving the medical opinion treated the
     claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence,
     especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician
     provides supporting explanations for their opinions and the
     degree to which these opinions consider all the pertinent
     evidence about the claim;

--whether the opinion is rendered by a specialist about medical
     issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the
     opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner, 499 F.3d at 848.

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a

66

treating physician's opinion.  20 C.F.R. § 404.1527(c).  "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)).  "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527; Shontos, 328 F.3d at 425; Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.  Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating

physician's evaluation.  Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)

(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)).

The ALJ must give "good reasons" for the weight accorded to opinions of

treating physicians, whether that weight is great or small.  Hamilton v. Astrue,

518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. § 404.1527(c)(2).   This

requirement was recently explained by the Eighth Circuit in Lucus v. Saul,

___ F. 3d ___ ; 2020 WL 2892228 at **2-3 (8th Cir., June 3, 2020).  In Lucus,

the claimant appealed from the denial of his application for disability benefits,

arguing the ALJ failed to properly provide good reasons for giving his treating

physician's opinions limited weight.  Id. 2020 WL 2892228 at * 1.  The district

court held the ALJ's explanation was inadequate, but that the error was

harmless because Mr. Lucus himself had failed to explain what greater

limitations to his RFC could have been found had his treating physician's

opinion been given greater weight by the ALJ.  Id.  The Eighth Circuit reversed

and remanded.  Id. at  *1 and * 3.

The Lucus court found the ALJ committed legal error by failing to provide

"good reasons" for the weight accorded to the treating physician's opinion.  Id.

at * 3.   In Mr. Lucus' case, the ALJ provided two reasons for failing to accord

controlling weight to the treating physician's opinion, but neither of those

reasons were "good."  Id. at ** 2-3.  First, the ALJ stated the treating

physician's opinion was internally inconsistent.  Id. at * 2.  But, the court

noted, "rather than identify a specific inconsistency, the ALJ simply listed ten

of [the doctor's] conclusions without explaining why [the ALJ] believed they

68

were incompatible or undermined her credibility." Id.  The second reason offered by the ALJ was that the doctor's statement regarding Mr. Lucus' problems in crowds and unfamiliar places conflicted with the record as a whole and with the doctor's own treatment notes.  Id.  The ALJ did cite statements from the doctor's notes in support of this second reason for rejecting the doctor's opinion.  Id.  Nevertheless, the court found this second reason also was not "good" because the ALJ left out important context and failed to mention other facts detrimental to the ALJ's ultimate conclusion that the doctor's statement conflicted with the record and with the doctor's own treatment notes.  Id.

The court emphasized that SSA guidance mandates the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers  . . . the reasons for the [for the decision]." Id. (citing SSR 96-2p).  The court concluded the reasons offered by the ALJ in Mr. Lucus' case were not "good" reasons as required by 20 C.F.R. § 404.1527(c).  Id. at * 3.  Though inconsistencies could justify rejecting a treating physician's opinion, the ALJ did not make its reasoning sufficiently specific to make it clear to subsequent reviewers.  Id. (citing SSR 96-2p and Reed, 399 F.3d at 921).  The court explained that absent some explanation for finding an inconsistency where none appeared to exist "we will not fill in the gaps for the ALJ." Id.  The court also stated that while exhaustive explanations are not required, "boilerplate" or "blanket" statements

will not suffice.  Id.  While the ALJ mentioned 20 C.F.R. § 404.1527, it either ignored or failed to discuss facts highly relevant to the factors listed therein. Id.  For example, the ALJ never mentioned that the treating physician treated Mr. Lucus regularly for a significant period of time, that the physician was a specialist which made the opinion especially relevant, or that Mr. Lucus relied on his therapist to help him function in public.  Id.

Finally, the court found the ALJ's error was not harmless.  Id.  An error is harmless "when the claimant fails to provide some indication that the ALJ would have decided differently if the error had not occurred." Id. (cleaned up). The Commissioner argued the ALJ's error was merely a drafting error.  But the Eighth Circuit disagreed, stating the failure to comply with SSA regulations is more than a drafting error.  Id.  The failure to give good reasons for rejecting a treating physician's opinion is "reversible error."  Id.  The court explained that because it could not determine whether the ALJ would have reached the same decision denying benefits if it had followed the proper procedure for considering and explaining the value of the treating physician's opinion, the error was not harmless.  Id.  See also Brueggeman v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003) (contrasting a "mere drafting oversight" with the "failure to follow . . .[t]he Commissioner[s]] duly promulgated regulations.").

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e).  Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination."  House, 500 F.3d at 745 (citing

Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).  See 20 C.F.R.

§ 416.927(e)(3).  The ultimate issues reserved to the Agency are as follows:

1.    whether the claimant is disabled;

2.    whether the claimant is able to be gainfully employed;

3.    whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.    what the claimant's RFC is; and

5.    what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849

(the ALJ "need not adopt the opinion of a physician on the ultimate issue of a

claimant's ability to engage in substantial gainful employment.") (quoting

Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)).  The RFC determination is

specifically noted to be one of those determinations that is an ultimate issue for

the Agency to determine.  20 C.F.R. § 416.927(e)(2); Cox v. Astrue, 495 F.3d

614, 619-620 (8th Cir. 2007).

Here, Ms. Clarambeau does not contest the manner in which the ALJ

evaluated the opinions of Drs. Studelska (the chiropractor) and Timmer (the

family physician).  The court does not analyze those medical opinions.

Ms. Clarambeau does contest, however, the manner in which the ALJ

evaluated the opinions of Dr. Ripperda (rehabilitation specialist, AR888-89);

Dr. Rothrock (orthopedic specialist, AR1058); and Dr. Brunz (orthopedic

specialist, AR1104).

Each of those treating specialists opined Ms. Clarambeau is not capable
of sitting for more than 6 hours out of an 8-hour workday—thereby precluding
her from engaging in the sedentary RFC the ALJ ultimately formulated for her.
See SSR 96-9p, https://www.ssa.gov/OP_Home/rulings/di/01/SSR96-09-di-
01.html  (sedentary jobs generally require the ability to sit 6 hours out of an 8-
hour workday).

The ALJ rejected each of those opinions for reasons which
Ms. Clarambeau asserts are not "good" reasons as required by Hamilton, 518
F.3d at 610 ; Lucus, 2020 WL 2892228 at *3; and 20 C.F.R. § 404.1527(c)(2).

First, on March 15, 2017, Dr. Ripperda provided limitations for
Ms. Clarambeau.  AR888.  On that date, Dr. Ripperda stated Ms. Clarambeau
was limited to lifting 10 pounds, standing 3-5 hours per day, sitting 3-5 hours
per day, no kneeling, occasional bending, carrying and stairs, and that she
must be allowed to change positions frequently.  Id.  The ALJ gave
Dr. Ripperda's restriction limiting Ms. Clarambeau to only part-time work
"some" weight.  AR33.  But the ALJ carved out and rejected that portion of
Dr. Ripperda's opinion which limited Ms. Clarambeau to less than 6 hours of
sitting and the need for frequent position changes, stating "[her] symptoms
improved with treatment and except for some tenderness and occasional
limited ROM, [she] consistently had good physical examinations."  Id.  The ALJ
did not provide any specific citation to the record for the "good physical
examinations" to which it referred, or for the instances in which
Ms. Clarambeau's symptoms improved with treatment.  Additionally, as

72

explained above in section 3.a  of this opinion, good physical examinations do not necessarily equal "no disability" when one of the claimant's severe impairments is fibromyalgia.  And, as Ms. Clarambeau emphasizes, many of Dr. Ripperda's examinations of her were not "good" in any event.  See AR566, 636-39, 755-57, 889-90 (bilateral arm pain, numbness, and tingling confirmed with abnormal EMG and NCV studies).  See also, AR570 (exam revealed trace edema, hip pain with flexion, abduction, and internal rotation, pain with Fabers maneuver, tenderness over L4-L5 and L5-S1 facet joints, positive facet loading on the right side; some piriformis tenderness bilaterally; and greater trochanteric tenderness); AR576, 649, 787 (exam revealed pain to palpation over SI joints, mild tenderness over the lumbar paraspinals, and a pop with hip abduction, flexion, and adduction).  And finally, AR655, 793 (pain consistent with SI joint dysfunction with good, but temporary results from injection). These abnormal exam findings support the functional limitations imposed by Dr. Ripperda, but they were not acknowledged when the ALJ formulated the RFC.  Likewise, the injections offered only temporary improvement.  That the improvement was only temporary was likewise not acknowledged by the ALJ in the RFC formulation.

Next, in May, 2017, Dr. Rothrock limited Ms. Clarambeau to lifting less than 10 pounds, and to sitting/standing for only 4 hours per day.  AR1058. The ALJ gave Dr. Rothrock's opinion "some" weight because it was consistent with the record, but to as to Dr. Rothrock's opinion that Ms. Clarambeau could sit for less than 6 hours, the ALJ again carved that portion out and gave it

"less" weight.  The reason for the difference?  "Because the records support a finding that the claimant can perform a sedentary range of work."  AR32.  What records?  "She cared for her ailing mother and . . . engaged in exercise as possible for weight loss."  Id.  The ALJ's statement that "the records" support a finding Ms. Clarambeau can perform a range of sedentary work is wholly conclusory and adds nothing to the inquiry of how the ALJ reached that conclusion.  Collins, 648 F.3d at 872 ("The reviewing court will not speculate on what basis the Commissioner denied a social security disability claim.").  As for the statement that Ms. Clarambeau cared for her ailing mother and engaged in exercise to lose weight, the ALJ provided no facts to support how those two activities bore any relationship to the ability to work 8 hours per day, 5 days per week on a consistent basis.

The medical records that mention Ms. Clarambeau's caring for her mother or the exercise she did to lose weight are very non-specific about what physical activities she performed in the pursuit of those endeavors.  There is no detail provided in the record about whether Ms. Clarambeau's duties in caring for her mother involved sitting, standing, lifting, or carrying.  We do not know whether Ms. Clarambeau was required to assist her mother with ADLs such as bathing and dressing.  Did Ms. Clarambeau's care of her mother include such physically strenuous activities as transferring her mom from bed to bath and/or a wheelchair or other assistive device? Or perhaps she only did light laundry, cooked a few meals and paid her mother's bills for her?  In the absence of some further detail, that she "cared for her mother" is wholly

unhelpful to answering the question of whether Ms. Clarambeau has the ability to perform the requisite acts needed to work full-time day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923; SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

Likewise, the references to Ms. Clarambeau's efforts to exercise for weight loss purposes add nothing at all to the inquiry about her ability to function in the workplace.  The records refer to her physicians' recommendations that she undertake a "home exercise program"-with nary a mention of what such a program actually consisted of—and that she should do water aerobics.  See AR655, 793, 962, 975, 999. 1060, 1061.  There is not a hint of how often Ms. Clarambeau did either of these things, or for how long at a time.  Again, in the absence of some further detail, that Ms. Clarambeau did home exercises and water aerobics is simply not helpful to determine her ability to perform the requisite acts needed to work full-time day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Reed, 399 F.3d at 923; SSR 96-8p 1996 WL 374184 .

In June, 2018, Dr. Brunz limited Ms. Clarambeau to lifting 10 pounds, standing/walking for 4 hours with normal breaks, and sitting for 4 hours. AR1102-04.  Dr. Brunz noted these restrictions had originally been imposed by Dr. Rothrock in May, 2017.  AR1104.  In August, 2018, Dr. Brunz wrote a

75

letter indicating that though Ms. Clarambeau's symptoms improved after radiofrequency ablation treatment, she continued to have myofascial pain, and that she may still be limited in her ability to engage in medium or heavy work. AR1110.  Dr. Brunz did not define what he meant by medium or heavy work, nor did he assign any specific functional limitations.  Id.  Ms. Clarambeau assigns no error to the fact that the ALJ gave "less" weight to Dr. Brunz' August, 2018, letter, because he failed to define medium or heavy work, and because Dr. Brunz assigned no functional limitations.  See AR32 (ALJ's explanation of why it gave "less" weight to the August, 2018 letter).

Ms. Clarambeau does challenge the ALJ's rejection of Dr. Brunz' opinion that she should be limited to sitting less than six hours in an 8-hour workday, however, because the only reason the ALJ offered for dismissing that opinion was that Ms. Clarambeau's physical examinations were "mostly normal." AR32-33.  Ms. Clarambeau notes that contrary to the ALJ's statement, Dr. Brunz's examinations included abnormal findings such as diminished musculoskeletal range of motion, lumbar paraspinous tenderness, and exquisite right piriformis tenderness. AR1059.  He opined most of her symptoms were caused by piriformis dysfunction and myofascial pain. AR1060.  He noted myofascial pain and degenerative disc disease with lateral recess stenosis at L3, and prior surgery at L4 shown on her MRI.  AR1063.

Though the ALJ purported to give "some weight" to the opinion of each of these physicians, it rejected that particular portion of each opinion which limited Ms. Clarambeau to the ability to sit less than 6 hours a day in favor of

76

the opinions of the non-examining, non-treating State agency physicians who opined Ms. Clarambeau is capable of sitting more than 6 hours per day. As in <u>Lucus</u>, the reasons offered by the ALJ for rejecting this portion of her treating physicians' opinions are not good reasons.  <u>Lucus</u>, 2020 WL 2892228 at * 3, and 20 C.F.R.  § 404.1527(c)(2).  As in <u>Lucus</u>, the ALJ "left out important context" in many instances when justifying its rejection of the treating physicians' sitting limitation.  <u>Lucus</u>, 2020 WL 2892228 at * 2. Additionally, when weighing the medical opinion evidence, the ALJ mentioned 20 C.F.R. § 1527, but either "ignored or failed to discuss facts highly relevant to the factors listed therein."  <u>Lucus</u>, 2020 WL 2892228 at * 3.[14]

Instead, the ALJ improperly "cherry picked" the medical opinions of the treating physicians, purporting to give them weight but carving out the sitting restriction imposed by each of them and giving only that portion of their opinions little weight.   <u>Cole v. Colvin</u>, 831 F.3d 411, (7th Cir. 2016) (Social Security disability case remanded because the ALJ "cherry picked" the medical records to deny benefits).  This resulted in the formulation of a residual

---

[14] For example, though the ALJ mentioned that Dr. Ripperda, Dr. Rothrock, and Dr. Brunz each treated Ms. Clarambeau, the ALJ failed to acknowledge that each of these physicians is a specialist.  Dr. Ripperda is a rehabilitation specialist, while Dr. Rothrock and Dr. Brunz are both orthopedic specialists.  As specialists their opinions are entitled to more weight pursuant to 20 C.F.R. § 404.1527(c)(5).  The ALJ likewise did not mention the length of time any of these physicians treated Ms. Clarambeau—also a factor to be considered pursuant to 20 C.F.R. § 1527(c)(2)(ii).  Finally, that three treating specialists reached the same conclusion certainly seems a relevant "other" factor under 20 C.F.R. § 404.1527(c)(6), a factor the ALJ likewise ignored.

functional capacity not truly supported by the medical evidence.  For this reason, as well, remand is required.

**E.     Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Clarambeau requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

78

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  <u>Buckner</u>, 213 F.3d at 1011.  In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  <u>See also Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.  Ms. Clarambeau's motion to remand [Docket No. 13] is GRANTED.  The Commissioner's motion to affirm [Docket No. 15] is DENIED.

DATED this 11th day of June, 2020.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

79